IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| AUDRA FOX and JEAN GREEN, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 21 C 3897 |
| | ) | |
| v. | ) | Magistrate Judge Jeffrey Cole |
| | ) | |
| PHILLIPPE BUILDERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

"[T]here was enough discovery here to choke a horse. * * * [E]nough is enough."
*Walker v. Sheahan,* 526 F.3d 973, 978-81 (7th Cir.2008)

The parties are back before the court with yet another discovery dispute. Fact discovery in this three-year-old case about real estate commissions closed on June 14, 2024. That was after one or both of the parties missed four deadlines and needed five extensions totaling nearly an entire year of extra time. [Dkt. ##56, 57 (three months), 71, 72 (three and a half months), 84, 87 (opposed two and a half months), 94, 95 (month and a half due to medical issue), 96, 97 (one month)]. Those twelve months of extra time were twice what the parties originally assured the court that their fact discovery would take. It is often difficult to understand how often uncomplicated matters things can spiral out of control so badly, especially in simple cases, which is what this one appeared to be. But, unfortunately, it is not uncommon that they do, *see, e.g., Alight Sols. v. Thomson*, No. 20 C 3043, 2021 WL 5119111, at *1 (N.D. Ill. Nov. 3, 2021)(denying eleventh-hour motion for forensic inspection of devices and reopening of fact discovery after multiple extensions), despite the

continued criticisms from Courts of Appeals.[1]  And, while at the time they might seem appropriate – if not generous – endless extensions of discovery deadlines are ultimately harmful to the legitimate interests of the parties specifically and of society in general.

In any event, as fact discovery was finally dragging to the final finish line, the plaintiffs stuck their leg out and tripped things up at the last minute with yet another motion to compel at 6:50 p.m. on the evening discovery closed. [Dkt. #99].  Just a month earlier, the plaintiff filed a motion for a fifth extension of fact discovery on what was then the final day of fact discovery.  The motion was reluctantly granted, and the plaintiff was warned that "[f]iling an extension motion on the day discovery is to end is everywhere frowned upon, and often such a motion will be denied.... the plaintiffs should be under no misapprehension that this is the Final Extension." [Dkt. #97].  But, with their eleventh-hour motion to compel, the plaintiffs are, in effect, seeking yet another extension – really, a reopening – of fact discovery in this case.  They want to conduct forensic inspections of "all computers or other company-owned devices (tablets, phones, etc.) used by Kim Hansen, Rachael Phillippe, and Cortney Phillippe." How long all that will take, if allowed, the plaintiffs do not say. But, the impression is that, no matter how long that does take, it will beget something else of purported consequence that will necessitate another extension, and that something else will beget another something else, and so on. So, the question, after a year and a half of discovery and multiple

---

[1] Judges' failures to properly monitor discovery is a source of constant criticism by courts. It is deemed to be the source of increased costs of litigation and accounts for much of the abuses by plaintiffs' and defendants' lawyers, alike. *See, e.g., Malautea v. Suzuki Motor Co. Ltd.*, 987 F.2d 1536 (11th Cir. 1993)(Roney, J., concurring); *Miller UK Ltd v. Caterpillar, Inc*., 17 F.Supp.3d 711, 721-22 (N.D.Ill. 2014). See also Victor Marrero, *The Costs of Rules, The Rule of Costs*, 37 Cardozo L.Rev. 1599 (2016); Frank H. Easterbrook , *Discovery as Abuse*, 69 B.U.L.Rev. 635, 639 (1989). *Cf. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Swanson v. Citibank, N.A.*, 614 F.3d 400, 411–412 (7th Cir.2010); *Continental Insurance. Co. v. Chase Manhattan Mortgage Corp.*, 59 Fed.Appx. 830, 840 (7th Cir.2003).

extensions, is whether opening it all back up again so plaintiffs can comb through laptops, phones, and tablets, is justified – or is worth it. What more could the plaintiffs possibly hope to legitimately gain?

The Answer appears to be sick days. As this case enters its fourth year, essentially, we are down to arguing about how often Cortney Phillippe took sick days and how she took them: by phone, by text, or by email. This simple inquiry could have and should have been made years ago. In any event, the quest at issue goes back several months to one of the parties' many other discovery disputes. [Dkt. #80, at 13-15; #91, at 4-6]. The plaintiffs' theory seems to be that Cortney's mother, Rachael, played favorites, and that the plaintiffs were held to a higher standard than Cortney in terms of what one had to do to qualify for a commission. If, as the defendants claim, Plaintiff Fox and Cortney had an agreement to split commissions on homes sold by one or the other – and plaintiffs say they didn't – the plaintiffs say Cortney was off work so much that she didn't work on certain sales and would not have been entitled to commissions on those sales. To that end, the plaintiffs asked for, and received, Cortney's time sheets. [Dkt. #101, Pars. 3-5]. For example, her time sheets from 2021 show she worked 1,636 out 2,000 hours; essentially missing just over 45 days of work. (Hansen Dep., at 89). So, she missed a lot of days work.

Why the time sheets weren't sufficient for plaintiffs' needs, we don't know. Perhaps they think the time sheets are fake. But, for whatever reason, the plaintiffs now want to go through all the devices to find all the times the Cortney texted in, or emailed in, sick. Incredibly, the question was obvious and should have been apparent to anyone from the beginning. But we are asked to believe that this question did not occur to counsel until both Rachael Phillippe and Kim Hansen testified at their depositions on May 8th and May 13th, respectively, that employees called in sick in various

ways: by phone, by email, by text. (Kim Hansen Dep., at 89-90; Rachel Phillippe Dep., at 253-54). Armed with that unremarkable information, plaintiff then served a document request on the defendants on May 15th for "[a]ll communications in 2019 and 2020 between Cortney Phillippe and Rachael Phillippe and/or Kimberly Hansen related to Cortney Phillippe's call offs from work due to illness or health related reasons." [Dkt. #99-1, at 56 of 69]. That May 15th service date meant that defendant's response was due the day discovery was set to close, June 14th. Plaintiffs waited to the last minute once again and were on the edge of violating Local Rule 16.1(4).

On June 12th, defendant bluntly responded: "None." [Dkt. #99-1, at 56 of 69]. Plaintiff didn't believe the defendant's response and called defense counsel on it, whereupon defense counsel got a little huffy:

> Rachael Phillippe looked and found no documents from Cortney Philippe. Your [sic] sort of being silly about this. Why would she go to work, to send an e-mail to her mother, that she was not coming into work? That's stupid. She would just tell her mother in person at home. I am sorry but I don't have time to talk about this case today as I am in evidence depositions all day starting at 9 am.

[Dkt. #99-1, at 58 of 69]. This clearly is about the time in a case like this – three years in and with seemingly unending discovery extensions – that lawyers' tempers get short.

Both sides have their points. Why wouldn't Cortney simply tell her mother she was taking a sick day? On the other hand, the testimony from Rachael Phillippe and Kim Hansen was what it was. And it would suggest there were at least some emails and texts from Cortney. But the real problem here, it seems, is relevance – or, at least, the degree of relevance of a matter that should have been obvious to anyone from the outset of the case but which counsel now claim wasn't. And so, after years of discovery and avoidance of discovery timelines, we are now asked to allow the forensic examinations of laptops and other devices – after the close of discovery. The request for more time

4

to take more discovery "bring[s] to mind George Jacques Danton's famous phrase--l'audace, encore de l'audace, toujours de l'audace (audacity, more audacity, always audacity)...." *United States v. Walsh*, 700 F.2d 846, 850 (2d Cir. 1983). Is that book worth the candle?

The plaintiffs' motion posits two possibilities. The first is that there was no agreement between Plaintiff Fox and Cortney to split commissions. Based on Kim Hansen's testimony at her deposition that items were missing from Cortney's personnel file and one of those items was the purported agreement to split commissions (Kim Hansen Dep., at 42-44, 52-53, 78-79), and the fact that the defendant has apparently not produced such an agreement in discovery, that seems the much more likely possibility. Kim Hansen testified that when Plaintiff Fox came on board, "there was a document saying that she was splitting commissions with Cortney . . . ." (Kim Hansen Dep., at 42). The document was in Plaintiff Fox's hiring package. (Kim Hansen Dep., at 42). She didn't recall what the document looked like, but was sure it was in writing. (Kim Hansen Dep., at 43). She also said there should be copy of the document in Cortney's personnel file (Kim Hansen Dep., at 44) and that she received these documents from Rachael Phillippe. (Kim Hansen Dep., at 44). But, when she looked for it in the personnel files during her deposition, it wasn't there. She explained that "everything's been kind of taken out because of this lawsuit, so I didn't find the exact document I was looking for. (Kim Hansen Dep., at 52). She said the documents were "probably with Rachael or Bob." (Kim Hansen Dep., at 53). Apparently, however, it wasn't.

At the very least, it seems the possibility that there was such an agreement is going to be the exceedingly more difficult possibility for the defendant to prove if this case should ever get to the substantive issue phase. But, that will be a matter for Judge Valderrama. In any event, if that's the case, then plaintiffs have no argument for relevance because they tie the relevance of Cortney's

attendance record to the existence of such an agreement; an agreement they deny existed.

The second possibility is that there was such an agreement. But if there was, the plaintiff doesn't explain why Cortney's absences would matter if she and Plaintiff Fox agreed to split commissions. If such an alleged agreement was actually made, the amount of work the two did on each sale didn't matter. At least that's the testimony from Rachael Phillippe, which is all there is about any such purported agreement:

> Q How often was it expected that Cortney might be absent?
>
> A That's an impossible question to answer.
>
> Q Well, going back to the period in time that Audra was working there, do you recall how often Cortney actually was absent?
>
> A You have the time sheets. We sent you every time sheet during the time that she was with – working with Audra. So the answer is on the time sheets.
>
> Q Okay. So your testimony, the time sheets are correct?
>
> A Yes.
>
> Q And if there were periods of time or weeks where Cortney was absent, then, would she still -- was the agreement -- is it your testimony that the agreement was still -- that despite these absences, that Cortney would share, 50/50, in the commissions sold out of that model home with Audra?
>
> A There -- there was never a change in that decision.

(Rachael Phillippe Dep., at 274-75). That seems like a terrible deal, splitting commissions no matter how much work you, or the other person, do, especially when you have allegedly been told that the other person was going to be missing work a lot due to her "health status. (Rachael Phillippe Dep., at 269-71, 273-74, 279). And, it does make it more unlikely that such a deal existed. But, again, that's a matter for substantive motions and trial if the parties ever complete discovery. What matters is that, if there were an agreement and those were the terms, Cortney's absences aren't terribly

6

relevant, whether she called in, texted in, or told her mother in person.

Judges and magistrate judges have broad discretion in tailoring discovery and resolving discovery disputes. *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998); *Alicea v. Cnty. of Cook*, 88 F.4th 1209, 1218 (7th Cir. 2023). Here, within that broad discretion, I find that given the limited relevance of Cortney's sick days, the eighteen months of fact discovery the parties have already slogged through, the last minute nature of the plaintiffs' requests for extensions and the motion to compel, a forensic examination of perhaps six – or more – devices is out of proportion with the needs of this case and the issues at stake. *See* Fed.R.Civ.P. 26(b)(discovery must not only be relevant but "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."). Discovery simply cannot go on endlessly until a plaintiff has everything it possibly could hope for or imagine. *Cf. Walker v. Sheahan,* 526 F.3d 973, 978, (7th Cir.2008). Discovery "must have an end point." *Stevo v. Frasor*, 662 F.3d 880, 886 (7th Cir.2011). *See also Lock Realty Corp. IX v. U.S. Health, LP*, 707 F.3d 764, 772 (7th Cir.2013). In managing their caseloads, district courts are entitled to—"indeed they must—enforce deadlines." *Raymond v. Ameritech Corp*., 442 F.3d 600, 605 (7th Cir.2006) (internal citation and quotation marks omitted)*. See also Flint v. City of Belvidere*, 791 F.3d 764, 768 (7th Cir. 2015). With the fifth fact discovery deadline in the rear-view mirror, enough is enough. *See Alicea v. Cnty. of Cook*, 88 F.4th 1209, 1219 (7th Cir. 2023)("Nor is a district court obligated to permit additional discovery after the close-of-discovery deadline has passed, a deadline [the] Judge . . . extended multiple times in this case."). All good things must come to an end – including discovery. *U.S. ex*

*rel Taylor v. Hicks*, 513 F.3d 228, 238 (5th Cir. 2008). *See also Sapia v. Board of Ed.*, 351 F.Supp.3d 1125, 1133 (N.D.Ill. 2019).

That being said, the defendant is by no means without blame – far from it – and has, often dragged its feet in responding to discovery requests either because of recalcitrance or perhaps because it was overwhelmed by its discovery obligations in this case. That curt email response [Dkt. #99-1, at 58 of 69], is one example. Some of the defendant's rather haphazard responses to discovery [Dkt. # 91] and terse response brief – brief is certainly an apt description – are others. And again, that type of thing seems to be a fairly common product of discovery dragging on for too long. But, if Cortney's sick days are not terribly relevant, the purported agreement to split commissions regardless of who did the work or of who even showed up at work certainly is. Accordingly, the Motion to Compel [99] is granted as follows. Defendant has three options. It may: (1) produce for forensic inspection all company-owned devices (laptops, tablets, phones, etc.) used by Kim Hansen, Rachael Phillippe, and Cortney Phillippe, within five[2] days, or (2) produce Cortney's entire personnel file within five days and certify that it is the entire file including the missing items Kim Hansen referred to,[3] or (3) produce any written agreement – hard copy or digital – as to the splitting of commissions between Plaintiff Fox and Cortney within five days. Other than that, however, fact discovery did, in fact, close on June 14th and it will remain closed, without any further exceptions! *See Velez v. City of Chicago*, 2021 WL 2915117, *1 (N.D.Ill. 2021).

---

[2]*See* Fed.R.Civ.P. 6(a)(1).

[3] There is, as defense counsel has been reminded, a Protective Order in place. [Dkt. ##22, 91, at 5].

ENTERED: _____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7/1/24