**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| AUDRA FOX AND JEAN GREEN,<br><br>  Plaintiffs,<br><br>v.<br><br>PHILLIPPE BUILDERS, INC.,<br><br>  Defendant. | Case No. 21-cv-03897<br><br>Hon. Albert Berry III |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs brought suit alleging that Defendant Phillippe Builders, Inc. violated the Illinois Sales Representative Act by failing to pay commissions earned by Plaintiffs on home sales they solicited. This case proceeded to a bench trial on October 6 and 7, 2025. Having now considered the testimony, admitted evidence, arguments of the parties, and relevant case law, the Court enters a verdict in favor of Plaintiffs and awards total damages in the amount of $52,895.59 to Audra Fox and $140,581.64 to Jean Green. Additionally, as discussed below, the Court awards attorney's fees in an amount to be decided at a later date. This decision sets forth the Court's findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

**FINDINGS OF FACT**

The following findings of fact are taken from the parties stipulated facts (Dkt. 138), and additional facts based on trial testimony and admitted documentary evidence. The findings are also based on the Court's credibility determinations after observing witnesses testify and matters subject to judicial notice. All findings are by a preponderance of the evidence or, when applicable, clear and convincing evidence.

1.      Defendant Phillippe Builders, Inc. ("Defendant") is an Illinois corporation that builds and sells custom homes in Northwest Indiana, Will County in Illinois, and the south Chicago suburbs.  (Dkt. 138 at ¶¶ 1-2).

2.      Plaintiffs Audra Fox ("Fox") and Jean Green ("Green") (collectively, "Plaintiffs") contracted with Defendant to solicit sales of custom homes as "home sales consultants," and were both compensated, in part, by commission. (*Id.* at ¶¶ 3-4, 7-8, 17-18).

3.      Both Plaintiffs were "Sales Representatives" as defined in the Illinois Sales Representative Act ("ISRA"), 820 ILCS 120/1(4). (*Id*. at ¶ 26).

4.      Defendant was a "Principal" as defined in the ISRA, 820 ILCS 120/1(3). (*Id*. at ¶ 5).

5.      Home sales consultants were expected to show prospective buyers around Defendant's model homes and discuss the different floor plans and other modifications that Defendant offered. (Dkt. 140 at 24:13-24)[1].

6.      Once a prospective buyer had decided on the floor plan for purchase and selected from the menu of fixtures and modifications they desired, the home sales consultant would solicit the sale of the home by having the prospective buyer sign a contract; the home sales consultant would then send the contract to Defendant's main office to be signed by Defendant's owner, Robert Phillippe. (*Id.* at 25:13-26:15).

7.      Although the contract included the base price of the home and any modifications agreed on at the time of execution, the final sale of the home would often change due to additional modifications that buyers selected during the home building process, which were reflected in change orders. (*Id.* at 29:12-30:17).

---

[1] Dockets 140 and 141 are the transcripts of the bench trial that took place on October 6 and 7, 2025, respectively. The transcripts are cited with eh following format – *Page number:Line number*.

8.      After the contract was signed, the buyer had a five-day revocation period; once the revocation period expired, the buyer was "locked into the contract," and became "a customer of Phillippe Builders." (*Id.* at 95:7-12; 100:23-25; Plaintiffs' Exhibit 15 at ¶ 46).

9.      Robert Phillippe could not recall any time when a buyer asked to be let out of an executed contract after the revocation period had expired. (Dkt. 140 at 116:4-12).

10.     Kimberly Hansen testified that in her 14 years working for Defendant, she could only recall approximately four occasions where a buyer could not fulfill their obligation to close on a property, those being due to death or failure to secure financing. (Dkt. 141 at 228:1-22).

11.     Robert Phillippe testified that the duties of a home sales consultant included assisting buyers with any structural or material changes they wanted to make during the building process and ensuring that those price differences were reflected in the amount the buyers paid Defendant in the final tally at closing. (*Id.* at 133:5-19).

12.     He further testified that "the work begins" once a contract is signed because Defendant has to make whatever changes the client might want, which "takes time to design, price, and get to the home consultant to make sure that whatever difference in prices we charge them accordingly." (Dkt. 140 at 133:5-12). According to Robert Phillippe, that is what the home sales consultants were hired to do. (*Id.* at 133:13-19).

13.     However, the evidence also showed that significant work was done by home sales consultants prior to signing the contact. According to Rachel Randall, a former nine year employee of Phillippe Builders, Inc., home consultants had to take an interested party, "which might just be -- whether it was somebody who walked into a model home or somebody who called the office or e-mailed in and expressed some interest and you had to capture all of their information and develop a relationship with them, walk them through some examples of Phillippe homes so they can see

3

the quality of construction, got to sit down and learn what they wanted in their project, work with [Robert Phillippe] typically to do pricing on a custom home, write the sales contract once you had an agreement of where and what we're building for, you know, at what location and what price point, and then you had to document all of the 400 or more selections of all the ingredients that go into a home." (Dkt. 141 at 282:22-25; 285:14-286:1).

14.     The advertisement for the home sales consultant position listed the responsibilities or duties, including: "showing homes to prospective homebuyers;" "closing sales for new homes;" "maintaining a positive client experience by setting accurate expectations and educating customers on the home building/buying process;" "following up and communicating with homebuyers in a timely, proactive manner;" "coordinating and assisting clients with selections;" "reaching out to realtor community to help create outside realtor generated sales;" "utilizing contact management software;" "maintaining office and community appearance to the highest standard;" and "handling multiple priorities effectively." (Plaintiffs' Trial Exhibit 1).

15.     The reason that Defendants wanted home sales consultants to provide a positive client experience and maintain contact with the homebuyers during the material selection process was to increase the chances that the buyer would refer future business to Defendant. (Dkt. 140 at 60:2-61:5; 104:21-105:10; Dkt. 141 at 315:13-16).

16.     Home sales consultants were paid pursuant to a tiered percentage compensation system, wherein they would receive 1.75% on the first million dollars of closed sales in a calendar year, 2% on closed sales between $1,000,001 and $2,999,999 in a calendar year, 2.25% for all sales between $3,000,000 and $4,999,999 in a calendar year, and 2.5% for all sales over $5,000,000 in a calendar year.[2] (Plaintiffs' Trial Exhibit 7).

---

[2] When Fox first started as a home sales consultant, the 2.5% tier did not exist, but that is irrelevant to this Court's discussion as she never reached that threshold in her sales. (Plaintiff's Exhibit 3).

17.     Home sales consultants would receive 1% of "total selling price on homes sold by a realtor at any stage of the build or completed." (*Id.*).

18.     Defendant's Employment Handbook stated that homes sales consultants "will receive, at the discretion of Phillippe Home Builders, Inc., paid commission on contracts closed within 4 weeks of their last day of work." (Plaintiffs' Trial Exhibit 6 at page 16).

19.     The Employment Handbook also says "[n]othing in this Handbook is intended to or should be construed as an agreement and/or a contract, express or implied." (*Id.* at page 2).

20.     Robert Phillippe testified that Defendant did not pay a commission to a home sales consultant when a sales contract was executed because they had not "done all the work to get to the closing." (Dkt. 140 at 164:14-19).

21.     He further stated that it was not Defendant's practice to pay homes sales consultants for commissions on homes where the homes sales consultant had solicited a sale on an executed contract but resigned or was terminated before closing (Dkt. 140 at 167:11-16), unless the resignation occurred within four weeks of closing. (*Id.* at 180:13-16).

22.     Otherwise, it was the custom and practice of Defendant to pay commissions within seven days of the home closing. (*Id.* at 181 at 5-8).

23.     Fox's first day as a home sales consultant for Defendant was May 17, 2019, and her last day was March 9, 2020. (Dkt. 138 at ¶¶ 10-11).

24.     The following table reflects properties for which Fox solicited sales during her tenure with Defendant (Dkt. 138 at ¶ 12; Defendant's Trial Exhibit E):

| Lot#/ Community | Contract Date | Close Date | Contract Price | Commission |
|---|---|---|---|---|
| 1368 MG | September 20, 2019 | January 24, 2020 | $314,900 | $5,510.75 |

| 1171 AG | January 24, 2020 | February 4, 2020 | $320,000 | $5,600 |
|---|---|---|---|---|
| 1172 AG | October 26, 2019 | February 24, 2020 | $308,420 | $5,397.35 |
| 1365 MG | February 27, 2020 | May 5, 2020 | $313,300 | $3,133 (realtor) |
| 778 MG | October 17, 2019 | July 10, 2020 | $706,347 | $7,063.47 (realtor) |
| 1364 MG | January 25, 2020 | September 18, 2020 | $371,568 | 7,289.66[3] |
| 1202 AG | February 15, 2020 | October 5, 2020 | $353,481 | $7,069.62 |
| 12 SR | March 2, 2020 | November 12, 2020 | $415,699 | $8,313.98 |
| 1300 AG | February 15, 2020 | February 26, 2021 | $421,113 | $7,369.48 |
| 1301 AG | December 21, 2019 | April 22, 2021 | $340,273 | $5954.78 |

25.     Fox was paid a commission of $2,755.00 on January 31, 2020 for Lot 1368 MG, which represented 0.87% of the home sale price. (Defendant's Trial Exhibit E).

26.     Fox was paid a commission of $ 2,800.00 on February 14, 2020 for Lot 1171 AG, which represented 0.87% of the home sale price. (*Id.*).

27.     Fox was paid a commission of $ 2,695.00 on March 6, 2020 for Lot 1172 AG, which represented 0.87% of the home sale price. (*Id.*).

28.     Fox was paid a commission of $1,556.50 on May 5, 2020 for Lot 1365 MG, which represented 0.50% of the home sale price because it was a realtor sale. (*Id.*).

---

[3] The first $56,680 earned 1.75% commission before the $1,000,000 threshold was reached and the 2% commission applied to the remainder of this sale and all other sales closed in 2020.

29. The evidence submitted in the case shows that Fox was typically paid her commission a maximum of 17 days after closing prior to the termination of her contract with Defendant. (Defendant's Trial Exhibit E).

30. Fox was not paid commission on the other six properties listed in the table above at paragraph 24.

31. The above-referenced commission checks (the four properties on which Fox was paid) were less than 1.75% of the home sales because Fox split commissions with Robert Phillippe's daughter, Cortney Phillippe.

32. Fox testified that she never agreed to split commissions with Cortney Phillippe. (Dkt. 140 at 22:6-12).

33. Fox further testified that she complained about splitting commissions to Defendant's Human Resources employee, Kimberly Hansen, and Rachael Phillippe (Cortney's mother, Robert's wife, and the Sales and Marketing Director for Defendant) because Fox did not feel it was fair to split her commission with Cortney Phillippe. (Dkt. 140 at 33:6-23).

34. There is no written agreement documenting an accord to split commissions between Fox and Cortney Phillippe. (Dkt. 140 at 22:13-19).

35. During Fox's entire tenure as a home sales consultant, Cortney Phillippe was paid – at least in part – as a W2 employee, typically getting paid between $300 and $600 per week. (Dkt. 141 at 214:13-216:25; Plaintiffs' Trial Exhibits 10-12).

36. Rachael Phillippe testified that she had a conversation with Fox and Cortney Phillippe about splitting commission checks because they were both working as home sales consultants in the same development, and that they agreed to sharing commission. (Dkt. 141 at 328:2-13). Kimberly Hansen was not present for any such conversation but was instructed to split

commission in half between Fox and Cortney Phillippe by either Rachel Phillippe or Robert Phillippe. (Dkt. 141 at 252:25-253:23).

37. Green's first day as a home sales consultant for Defendant was March 1, 2020, and her last day was May 7, 2021. (Dkt. 138 at ¶¶ 21-22).

38. Prior to leaving, Green had already earned commissions on $2,173,193.60 in total closed sales in 2021 for the following properties: AG 1299 ($404,531.59), AG 1376 ($360,314.29), AG 1377 ($383,719.07), SR 23 (337,675.25), SR 24 ($329,103.00), and SR 68 ($357,850.42). (Defendant's Trial Exhibit I).

39. The following table reflects some properties for which Green solicited sales during her tenure with Defendant. (Defendant's Trial Exhibit I).

| Home | Contract Date | Close Date | Close Price | Commission |
|---|---|---|---|---|
| AG 1197 | August 14, 2020 | July 21, 2021 | $366,275.05 | $7,325.50 |
| AG 1302 | September 20, 2020 | August 20, 2021 | $403,677.45 | $8,073.55 |
| AG 1198 | April 19, 2021 | October 7, 2021 | $406,940.41 | $9,014.02[4] |
| AG 1373 | October 3, 2020 | October 28, 2021 | $428,591.34 | $9,643.31 |
| AG 1375 | October 18, 2020 | November 19, 2021 | $576,819.34 | $12,978.44 |
| AG 1374 | October 10, 2020 | December 3, 2021 | $384,544.37 | $8,652.25 |
| AG 1305 | October 9, 2020 | December 16, 2021 | $397,614.56 | $10,397.80[5] |
| AG 1304 | January 10, 2021 | December 21, 2021 | $441,907.75 | $11,047.69 |
| GG 907 | February 9, 2021 | February 11, 2022 | $629,391.51 | $11,014.35 |
| AG 1383 | February 5, 2021 | February 25, 2022 | $389,155.17 | $6,856.58[6] |
| AG 1204 | April 19, 2021 | March 1, 2022 | $425,985.29 | $8,519.71 |
| AG 1382 | February 7, 2021 | March 11, 2022 | $449,091.97 | $8,981.84 |

[4] The first $56,853.90 earned 2% commission before the $3,000,000 threshold was reached and the 2.25% commission applied to the remainder of this sale. As noted above, Plaintiff had already been paid on sales exceeding the $1,000,000 threshold in 2021.

[5] The first $259,958.42,853.90 earned 2.25% commission before the $5,000,000 threshold was reached and the 2.5% commission applied to the remainder of this sale and all other sales closed in 2021.

[6] The first $370,608.50 earned 1.75% commission before the $1,000,000 threshold was reached and the 2% commission applied to the remainder of this sale.

8

| AG 1289 | November 6, 2020 | March 31, 2022 | $341,086.48 | $6,821.73 |
| AG 1381 | March 1, 2021 | April 13, 2022 | $320,718.13 | $6,414.36 |
| AG 1380 | February 27, 2021 | May 13, 2022 | $398,180.14 | $10,968.39[7] |
| AG 1284 | February 6, 2021 | August 12, 2022 | $527,649.96 | $11,872.12 |

40.     Green was not paid commission for any of these home sales. (*Id.*; Dkt. 140 at 77:5-15, 80:13-16).

41.     The evidence submitted in the case shows that prior to the termination of her contract with Defendant, Green was typically paid her commission a maximum of 22 days after closing. (Defendant's Trial Exhibit I).

42.     Green testified that she agreed that she would pay Cortney Phillippe $500 for entering data into the software program Defendant used to track customer choices during the building process. (Dkt. 140 at 194:14-17).

43.     On April 22, 2021, Green and Defendant entered into a "Release Agreement," that stated that Green's last day would be May 7, 2021, and she would need to return certain property, devices, and information to Defendant. (Defendant's Trial Exhibit H). The agreement also stated that if Green met those conditions, Defendant would pay Green commission on five properties that were closing in April, May, and June 2021 "within 10 business days from the date of closing." (*Id.*).

## CONCLUSIONS OF LAW

### A.  The ISRA Generally

44.     The ISRA states that "[a]ll commissions due at the time of termination of a contract between a sales representative and principal shall be paid within 13 days of termination, and

---

[7] The first $444,571.45 earned 2% commission before the $3,000,000 threshold was reached and the 2.25% commission applied to the remainder of this sale and all other sales closed in 2022.

commissions that become due after termination shall be paid within 13 days of the date on which such commissions become due." 820 ILCS 120/2.

45. "A principal who fails to comply with the provisions of Section 2 concerning timely payment or with any contractual provision concerning timely payment of commissions due upon the termination of the contract with the sales representative, shall be liable in a civil action for exemplary damages in an amount which does not exceed 3 times the amount of the commissions owed to the sales representative. Additionally, such principal shall pay the sales representative's reasonable attorney's fees and court costs." 820 ILCS 120/3.

46. "'Sales representative' means a person who contracts with a principal to solicit orders and who is compensated, in whole or in part, by commission, but shall not include one who places orders or purchases for his own account for resale or one who qualifies as an employee of the principal pursuant to the Illinois Wage Payment and Collection Act." 820 ILCS 120/1(4).

47. "When a commission becomes due shall be determined in the following manner: (A) The terms of the contract between the principal and salesperson shall control; (B) If there is no contract, or if the terms of the contract do not provide when the commission becomes due, or the terms are ambiguous or unclear, the past practice used by the parties shall control; (C) If neither (A) nor (B) can be used to clearly ascertain when the commission becomes due, the custom and usage prevalent in this State for the parties' particular industry shall control." 820 ILCS 120/1(2).

### B. Application of ISRA to Plaintiffs and Defendant

48. As noted above, the parties agree that Plaintiffs were sales representatives and Defendant was a principal under the ISRA.

49. The nature of sales work often leads to a gap between when an agreement for a sale is made between a sales representative and a customer and when the payment is received by the

10

principal. In many cases, the sales representative is not paid a commission for the order he or she solicits until the funds are received by the principal. Sometimes, a sales representative's relationship with the principal may terminate between when the order is solicited and when payment is received, and commission may become due after the sales representative has been terminated. The ISRA accommodates such situations by requiring that commission that becomes due after termination shall be paid within 13 days.

50.     One problem with the wording of the ISRA is that it considers when commission shall be paid to the sales representative (*i.e.*, when it "becomes due" or owed), but not when it is earned in the first place.

51.     The parties have often conflated the two ideas – when a commission is earned by the sales representative and when it becomes due from the principal to the sales representative. (*See* Dkt. 122 at 4-5). Unfortunately, the Court has been unable to find any case law addressing this issue, nor did the parties cite any.

52.     The Court concludes that these two concepts must be distinct in order for the ISRA to work properly. If commission is not earned until some time after the order is solicited, it leaves an enormous amount of space for an unscrupulous principal to exploit a sales representative.

53.     For example, a principal in Defendant's industry could sign a contract with their sales representatives stating that home sales consultants' commissions become due 10 days after closing, but they do not earn commission until they complete a list of tasks that includes presenting the keys to a new homebuyer at closing. The principal could then terminate the home sales consultant a week before the closing was scheduled to occur and successfully argue that the commission never became due. Although the sales representative solicited the order, she would not have earned the commission and it would never become due.

54.     Such an outcome would be antithetical to the ISRA, which is designed to protect sales representatives, like Fox and Green. *See Reinherz v. Sun Microstamping, Inc.*, No. 00 C 4407, 2000 WL 1774098, at *2 (N.D. Ill. Dec. 1, 2000) ("Two courts have found that the ISRA clearly expresses a 'fundamental policy of the state' . . . to protect the relative bargaining power and thus the commissions of sales representatives working in Illinois"); *see also*, *Maher & Assocs., Inc. v. Quality Cabinets*, 267 Ill. App. 3d 69, 75, 640 N.E.2d 1000, 1005 (Ill. App. 2d Dist. 1994) (the ISRA "constitutes the legislature's pronouncement that protecting sales representatives is fundamental public policy in Illinois"). Although Defendant did not do anything nearly so underhanded in this case, the principle is the same, as will be discussed more fully below.

55.     The Court believes that the more logical reading of the ISRA demands that sales representatives earn a commission upon soliciting orders. At that point, the principal owes the sales representative some future amount to be determined by the percentage of the final sale price. When that future amount becomes due (*i.e.*, when the principal must make good on the commission the sales representative earned by soliciting the order) is determined as outlined in 820 ILCS 120/1(2).

56.     Here, Plaintiffs were "sales representatives" as defined in the ISRA, meaning they were contracted to "solicit orders" and compensated by commission. Notably, sales representatives (as defined in the ISRA) are not contracted to close transactions or collect funds; they are not contracted to maintain positive client experiences or assist with selections of finishes. Under the plain language of the ISRA, they are contracted to solicit orders.

57.     Orders solicited by home sales representatives were reflected in the sales contracts described above. After the five-day revocation period expired, the buyer was "locked into the contract," and became "a customer of Phillippe Builders." The evidence shows it was exceedingly rare for a sale to fall through; Robert Phillippe could not remember a single instance and Kimberly

Hansen could only name a handful of times (approximately four) in 14 years that an executed contract had failed to lead to a closing, those only being through death of the buyer or loan approval falling through.

58. Once the five-day revocation period expired, it was a virtual certainty that Defendant would receive hundreds of thousands of dollars in revenue from the home sale solicited by Plaintiffs. In other words, after the five-day revocation period passed, the Court finds that Plaintiffs had successfully solicited orders for custom homes built by Defendant and had earned a commission on the sale.

59. The Court rejects Defendant's assertion that commission for home sales consultants were not earned until they had completed post-contract duties with the buyer prior to closing.

60. The other post-contract work – helping clients select finishes and decide on structural changes – was ancillary and separate from the home sales representative's work of soliciting orders. In fact, the testimony at trial demonstrated that this work was not about soliciting orders, making sales, or closing transactions, but was about seeking future business through word of mouth from satisfied customers. While, understandingly so, that may have been important to Defendant's ongoing business concerns, it was not related to soliciting orders for the sales in question in this case.

61. The Court concludes that these post-contract job duties may have been required for home sales consultants to meet Defendant's job expectations to continue working for Defendant, or to ensure that Defendant got future business referrals, but they were not what earned them commission under the ISRA – *i.e.*, soliciting orders.

62. The next question is when Fox and Green's commissions became due. Fox and Green maintain that their commissions became due on sales they solicited within seven days of

closing, even if the closing occurred after they had terminated their contract with Defendant. (Dkt. 145 at 8-9).

63. Defendant asserts that commissions were earned through the work done between execution of the sales contract and closing – maintaining positive client contracts, assisting buyers through the selection process for structural and design elements, etc. – and that Plaintiffs' commissions would not come due until that work was completed. (Dkt. 144 at 15-16).

64. If, as Defendant maintains, commission did not become due until Plaintiffs "completed the job duties and responsibilities of a Home Consultant and earned commissions on homes that went to closing," (Dkt. 144 at 14), it raises a host of questions that show such a position is untenable. Which job duties needed to be completed before a commission was earned and who determined whether they had been completed satisfactorily? What if Defendant felt that a home sales consultant had failed to maintain a positive client experience or was not proactive in following up and communicating with homebuyers in a timely manner, but the sale closed nonetheless? Could Defendant withhold commission from the home sales consultant due to a failure to complete the job duties and responsibilities, even though he or she had solicited the sale and Defendant had reaped the benefit? What if a home sales consultant assisted clients with selections, but was rude or unprofessional while doing so and did not maintain office and community appearance to the highest standard? Certainly, Defendant could choose to terminate the contract with the home sales consultant, but could the commission be reduced or withheld on sale that had been successfully solicited and closed?

65. Allowing the principal to determine when commissions are earned based on nebulous post-solicitation tasks leaves open the potential for abuse or, at the very least, creates

significant uncertainty for sales representatives. The Court does not believe that the ISRA supports such a reading.

66. Moreover, the ISRA anticipates the problem presented in this case. It states that "commissions that become due after termination shall be paid within 13 days of the date on which such commissions become due." In other words, it is possible for a sales representative to earn commissions by soliciting sales, but for those commissions not to become due until after termination.

67. Followed to its logical extreme as discussed in the hypothetical situation described above, Defendant's position would render this portion of the ISRA a nullity. A bad actor could ensure that commissions *never* became due to its sales representative after termination, and pocket the commissions for itself on orders successfully solicited by the sales representative.

68. Instead, the more sensible reading of the ISRA is for commissions to be earned at the time the order is solicited and for the Court to determine when commissions became due as dictated by the ISRA.

69. So, when do the commissions become due? Here, there was no relevant contract between Plaintiffs and Defendants dictating when commissions became due. The Employment Handbook specifically states that it is not a contract. The compensation agreements describe how much homes sales consultants will be paid, but is silent on timing.

70. Because there is no contract, under the ISRA, the Court looks to the past practice of the parties. 820 ILCS 120/1(2)(B).

71. On the evidence submitted to the Court, the longest either Plaintiff waited for a commission check after closing was 22 days. Therefore, the Court finds that the past practice of

the parties shows that, on sales solicited by home sales consultants, their commission became due within 22 days of closing.[8]

72.    Under the Court's reading of the ISRA, Plaintiffs' commissions were earned after the sales contracts were finalized (*i.e.*, after the five-day revocation period passed) and became due within 22 days of closing, pursuant to the parties' practice of paying commission to sales representatives within 22 days of closing on a property. As such, Plaintiffs' commissions that became due after termination on the sales they solicited should have be paid within 35 days after the relevant closing date – *i.e.*, within 22 days (past practice) plus the statutory 13 days under 820 ILCS 120/2.

73.    Accordingly, Defendant did not pay the commissions within the relevant statutory time period and violated the ISRA.

### C.  Commission Splitting Between Fox and Cortney Phillippe

74.    The Court finds that Fox did not agree to split her commissions with Cortney Phillippe. Fox's testimony was credible, and the Court believes that she complained to Rachael Phillippe and Kimberly Hansen about the commission-splitting arrangement. This is further bolstered by the fact that Fox left her employment within a few short months after her commission checks began getting cut in half, which tends to show that Fox was unhappy with the arrangement and did not agree to it.

75.    While Fox may have been forced to split her commissions with Cortney Phillippe, the Court does not believe that the evidence established that she agreed to do so.

---

[8] Defendant argues that commission never became due because it was not the parties' past practice to pay solely for the execution of a contract, and that the past practice required the post-contract tasks to be completed. However, as discussed above, the Court finds that Plaintiffs earned their commission upon the execution of the contract under the ISRA. The Court cannot base the determination of the parties' past practice on the instances where the Court believes Defendant violated the ISRA. Therefore, the relevant inquiry is when Defendant paid commission to Plaintiff on the properties where all parties agree commission had been earned.  Those will demonstrate the parties' past practice for when commission became due.

76. The Court found the testimony of Rachael Phillippe less credible, as she had a strong personal interest in seeing her daughter earn commissions. Additionally, Kimberly Hansen had no independent knowledge of such an agreement and was told to split the commissions based on an instruction from Rachael or Robert Phillipe, Cortney Phillippe's parents.

77. Furthermore, the evidence showed that Cortney Phillippe was paid as a W-2 employee, which indicates that she was an employee of Defendant and not a home sales consultant contractor.

78. Moreover, there is no written document memorializing this agreement, whereas the parties did memorialize the tiered commission structure in writing. This leads the Court to believe that there never was an agreement between Fox and Defendant to split commissions with Cortney Phillippe.

### D. Computing Commissions Due to Plaintiffs

79. Applying the tiered commission structure outlined above and removing the portions of commission she was already paid, Fox is owed $52,895.59 in commission for sales that she solicited while employed as a home sales consultant, but was not paid by Defendant. The Court derived this number by adding the commissions owed above ($62,702.09) and subtracting the amounts already paid to Fox ($9,806.50).

80. Applying the tiered commission structure outlined above and taking into account the $500 Green agreed to pay Cortney Phillippe on certain sales, Green is owed $140,581.64 in commission for sales that she solicited while employed as a home sales consultant, but was not paid by Defendant. The Court derived this number by adding the commissions owed above ($148,581.64) and subtracting the $500 that Green had agreed to pay Cortney Phillippe on these transactions ($8,000).

17

### E. Treble Damages and Attorney's Fees

81. Plaintiffs also seek treble damages under the ISRA, which provides that a principal who violates the ISRA "shall be liable in a civil action for exemplary damages in an amount which does not exceed 3 times the amount of the commissions owed to the sales representative." 820 ILCS 120/3. "In order for Defendant to be liable for exemplary damages under the Act, there must be evidence to support a finding of willful and wanton conduct." *B. Milborn & Assocs. v. Trident Press Int'l, Inc.*, No. 03-C-50002, 2004 WL 2538292, at *2 (N.D. Ill. Nov. 8, 2004). "The Seventh Circuit has defined willful and wanton under this Act as 'intentional and egregious conduct.'" *Id.* (quoting *Gramercy Mills, Inc. v. Wolens,* 63 F.3d 569 (7th Cir.1995)).

82. The Court does not believe there is any evidence that Defendant's conduct was willful or wanton. The evidence shows that Defendant did pay other home sales consultants – such as Rachel Randall – for the homes that Green had solicited sales but closed after her termination. It appears that the Defendant simply had a *bona fide* misunderstanding about how the ISRA worked. The Court does not believe treble damages are appropriate here and will not order the Defendant to pay treble damages.

83. The ISRA further states that "[a]dditionally, such principal shall pay the sales representative's reasonable attorney's fees and court costs" for violation of the ISRA. 820 ILCS 120/3. "Unlike with exemplary damages, Plaintiff need not show any culpability by Defendants to obtain reasonable attorney's fees and costs under the ISRA because 'these damages are compensatory and not punitive and because the plain language of section 3 of the Sales Act provides that attorney fees and costs 'shall' be imposed for a violation of section 2 of the Sales Act.'" *Cent. Tower Exch. Corp. v. German Motor Parts GmbH*, 518 F. Supp. 3d 1233, 1246 (C.D. Ill. 2021) (quoting *Maher & Associates, Inc. v. Quality Cabinets,* 267 Ill. App. 3d 69, 81, 203

18

Ill.Dec. 850, 640 N.E.2d 1000 (1994)). "Indeed, beyond a determination of what is truly 'reasonable,' the law gives the Court no room for discretion in awarding these sums to the sales representative." *Id.*

84. The Court finds that Plaintiffs are entitled to reasonable attorney's fees under the ISRA. To aid the Court in making the appropriate calculation, Plaintiffs are ordered to file an accounting of attorney's fees and costs within 14 days of the submission of this Memorandum Opinion and Order; Defendant may respond within 14 days of Plaintiffs' filing.

## CONCLUSION

The Court enters a verdict in favor of Plaintiffs and enters judgment on Count I in the amount of $52,895.59 for Audra Fox and enters judgment on Count II in the amount of $140,581.64 for Jean Green.

**DATED**: March 30, 2026

**ENTERED**:

ALBERT BERRY III
United States Magistrate Judge

19